THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA, | : |
| --- | --- |
| v. | : 3:16-CR-232 |
| | : (JUDGE MARIANI) |
| DONALD KORUS, | : |
| Defendant. | : |

## MEMORANDUM OPINION

### I. INTRODUCTION

On November 30, 2017, Defendant, Donald Korus, pleaded guilty to a single count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). In anticipation of sentencing, the Office of Probation prepared a Presentencing Investigation Report, (Doc. 26), and then subsequently a Revised Presentencing Investigation Report, (Doc. 43), which included a calculation of Defendant's total offense level under the United States Sentencing Guidelines. As part of this calculation, the Report recommends a four level sentencing enhancement under § 2K2.1(b)(6)(B) of the Sentencing Guidelines because Defendant possessed a firearm in connection with another felony, specifically the crime of terroristic threats, 18 Pa. C.S.A. § 2706(a). Presently before the Court is the objection of Defendant to this sentencing enhancement based upon his assertion that he did not possess the firearm in connection with another felony. An evidentiary hearing on this matter was held on February 15, 2018, in which both the Government and Defendant presented evidence. For the reasons that follow, the Court finds that Defendant did possess the firearm in connection

with another felony, and, consequently, the Report properly applied a four level sentencing enhancement under § 2K2.1(b)(6)(B).

## II. BACKGROUND

On October 2, 2015, at approximately 9:00 p.m., Defendant was at home when he heard a knock on the door. (Feb. 15, 2018, Hr'g Tr. at 44). Defendant went to the door and saw a man standing outside. (*Id.* at 45). Although he did not recognize the man, he later learned it was Fernando Lamolly. (*Id.* at 9-10). According to Special Agent Ryan Kovach, who had interviewed Lamolly, Lamolly stated that when Defendant opened the door, Lamolly explained that the Jeep in Defendant's driveway was being repossessed and then asked Defendant for the keys. (*Id.*). Defendant maintains that Lamolly demanded the keys without explanation and that Defendant surmised that the Jeep was being repossessed. (*Id.* at 45-46). Regardless, Defendant went outside in order to retrieve some personal belongings from the Jeep. (*Id.* at 48). Outside was another man, David Slater, who had come with Lamolly. (*Id.* at 13)

Defendant unlocked the Jeep and got into the driver's seat. (*Id.* at 48). Lamolly stood next to the open driver's side door and Slater stood opposite him on the passenger side of the vehicle. (*Id.* at 10, 13, 33-34, 48). According to Lamolly's version of events, Defendant immediately opened up the Jeep's center console, retrieved a .380 caliber Kel-

Tec pistol, stated that he had a permit to carry, racked[1] the gun, and then pointed the gun at Lamolly's head. (*Id.* at 11-13, 20). In response, Slater crawled into the back seat of the car and wrapped his arm around Defendant's neck. (*Id.* at 13-14). Once Slater grabbed Defendant, a scuffle ensued as Lamolly, who was afraid he was going to be shot, pushed Defendant's hand and the gun down. (*Id.* at 14-15). While the three men were struggling for the weapon, the gun discharged into the passenger side floorboard. (*Id.* at 15, 37). Lamolly and Slater were then able to pull Defendant out of the vehicle, take the gun from him, and hold him down until the police arrived. (*Id.* at 23).

According to Defendant, when he went outside to get his belongings out of the vehicle, Lamolly pushed Defendant several times and tried to prevent him from getting into the Jeep. (*Id.* at 48). When Defendant was able to get into the driver's seat, Lamolly began trying to rip Defendant out of the vehicle. (*Id.*). Defendant continued to attempt to get his property out of the car and ended up opening up the vehicle's center console. (*Id.* at 49). Defendant testified that he was shocked to find that his fiancée's gun was in the center console. (*Id.* at 49, 58). According to Defendant,

> When I opened up the console, I saw in there that the gun was in there. I didn't know it was definitely going to be in there that night. I know that she keeps it in there so it's not in the house with me and the kids, because I do have a felony, and I know we should have probably took better care than that, but the fact is that it was there, I didn't expect it to be there.

---

[1] According to Agent Kovach, "[r]acking a gun means putting a round into a chamber. If there's an empty chamber, in order to put a round into a gun, you have to rack it, which pulls a shell out of the magazine and puts it into the gun to shoot." (Feb. 15, 2018, Hr'g Tr. at 12).

(*Id.* at 49). According to Defendant, upon finding the gun, he immediately took it out and pointed it at the passenger side floorboard in an effort to keep the gun as far away from Lamolly as possible. (*Id.* at 49, 52-53, 57). Defendant testified that he never pointed the gun at anyone and was only trying to keep it from Lamolly because Defendant feared he would be shot if Lamolly got ahold of the pistol. (*Id.* at 50, 52, 57). During the struggle for the weapon, the gun discharged. (*Id.* at 53). The two men then pulled the Defendant out of the car and took the gun from him. (*Id.* at 55).

## III. DISCUSSION

Defendant contends that, although he committed the crime of being a felon in possession of a firearm, he did not possess the weapon in connection with another felony. Therefore, he argues, the Presentencing Report improperly added a four level enhancement when calculating his total offense level.

When sentencing a criminal defendant, "[a] district court must begin the process by first calculating the applicable [United States Sentencing] Guidelines range." *United States v. Levinson*, 543 F.3d 190, 194 (3d Cir. 2008). The applicable Guidelines range is determined by utilizing two numbers: the total offense level and the Defendant's criminal history category. See U.S. SENTENCING GUIDELINES MANUAL § Ch. 5, Pt. A (U.S. SENTENCING COMM'N 2016). To calculate the total offense level, a court must, among other things, use the Guidelines Manual to determine the base offense level for the crime committed and then

increase that number based upon any enumerated "specific offense characteristics." *See Id.* at § 1B1.1(a)(2).

As applicable to the case at hand, the Guidelines Manual provides for the following specific offense characteristic:

> **(6)** If the defendant—
>
> . . .
>
> **(B)** used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense,
>
> increase by 4 levels. If the resulting offense level is less than level 18, increase to level 18.

*Id.* at § 2K2.1(b). The comments to this section of the Manual specify that "'[a]nother felony offense', for purposes of subsection (b)(6)(B), means any Federal, state, or local offense, other than the explosive or firearms possession or trafficking offense, punishable by imprisonment for a term exceeding one year, regardless of whether a criminal charge was brought, or a conviction obtained." *Id.* at § 2K2.1 cmt. n.14(C).

The Government contends that Defendant possessed a firearm in connection with the state offense of simple assault, 18 Pa. C.S.A. § 2701, or terroristic threats, 18 Pa. C.S.A. § 2706. "[A] person is guilty of [simple] assault if he . . . attempts by physical menace to put another in fear of imminent serious bodily injury." 18 Pa. C.S.A. § 2701(a)(3). "A person commits the crime of terroristic threats if the person communicates,

5

either directly or indirectly, a threat to . . . commit any crime of violence with intent to terrorize another." 18 Pa. C.S.A. § 2706(a)(1). Although both crimes are classified as "misdemeanors" under Pennsylvania law, 18 Pa. C.S.A. §§ 2701(b), 2706(d), they are both punishable by a term of imprisonment exceeding one year, 18 Pa. C.S.A. § 1104, and are therefore each a "felony offense" for purposes of § 2K2.1(b)(6)(B) of the Guidelines Manual,[2] see U.S. SENTENCING GUIDELINES MANUAL § 2K2.1 cmt. n.14(C). The Government bears the burden of proving by a preponderance of the evidence that Defendant's possession of a firearm was in connection with another felony. *See United States v. Harris*, 751 F.3d 123, 127-28 (3d Cir. 2014); *United States v. West*, 643 F.3d 102, 104-05 (3d Cir. 2011).

Here, based upon his guilty plea, it is undisputed that Defendant possessed a firearm. Thus, the only question before this Court is whether the Government has proven by a preponderance of the evidence that Defendant's possession of the firearm was in connection with committing the crime of simple assault or terroristic threats. The Government has presented evidence, through Agent Kovach,[3] that during the repossession

---

[2] The only time simple assault is punishable by only one year of imprisonment—and would therefore not qualify as "another felony offense"—is when it is committed "in a fight or scuffle entered into by mutual consent." 18 Pa. C.S.A. §§ 1104, 2701(b)(1).

[3] "In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S. SENTENCING GUIDELINES MANUAL § 6A1.3(a) (U.S. SENTENCING COMM'N 2016); *see also United States v. Brigman*, 350 F.3d 310, 315 (3d Cir. 2003) ("Hearsay is fully admissible at a sentencing hearing, so long as it has sufficient indicia of reliability."); *United States v. Brothers*, 75 F.3d 845, 848 (3d Cir. 1996) ("The use of hearsay in making findings for purposes of Guidelines sentencing violates neither the Sentencing

6

of Defendant's fiancée's car, Defendant pointed a loaded gun at Lamolly's head in a threatening matter and Lamolly feared he was going to be shot. (Feb. 15, 2018, Hr'g Tr. at 11-15). Defendant, on the other hand, testified that he never pointed the gun at anyone that night. (*Id.* at 57). The Court, however, does not find Defendant's testimony on certain facts material to this Court's decision as set forth herein, credible.

First, some of Defendant's testimony during the hearing was contradicted by his own prior statements. Specifically, Defendant testified at the hearing that he did not expect to find the gun in the car because he assumed that his fiancée had taken it to work. (*Id.* at 49, 58). In a statement Defendant gave to the police on the night of the incident, however, he wrote that the following took place after Lamolly arrived:

> I wanted to go out and see if [Lamolly] was with a tow truck, and if he was, to remove my personal property from the car, and paperwork, and my fiancée had her firearm in the console from when she works late, and we keep it in there so the kids dont [sic] have access to it. I went out and had to force pass him to open my Jeep to get in and remove my things. I was in the drivers [sic] seat, when *I opened the center console top portion to remove Brittneys* [sic] *firearm* . . . .

(Gov't Ex. 5) (emphasis added). This statement indicates that Defendant knew the gun was in the center console before he went out to the car.

Second, the objective video evidence tends to support Lamolly's version of events over Defendant's version of events. Specifically, Defendant's testimony was that he went

---

Reform Act of 1984 nor the Due Process Clause."); *United States v. Miele*, 989 F.2d 659, 664 (3d Cir. 1993) ("[I]n a sentencing proceeding, the district court may credit hearsay evidence over sworn testimony, especially where there is other evidence to corroborate the inconsistent hearsay statement.").

out to the Jeep to retrieve property, found the gun, and then simply tried to keep the gun out of the hands of Lamolly and Slater. A video of the incident, however, undercuts Defendant's story. While nothing can be clearly seen on the video—which was taken with a cell phone in the dark—the following verbal exchange can be heard:

> Defendant: "I have a license to carry. I have a fucking license to carry. Get the fuck out of my property."
>
> Lamolly: "You pull a gun on me, you pull a gun on me."
>
> Defendant: "You're on my property right now."

(Gov't Ex. 2). Defendant's testimony failed to explain why, if he was just retrieving his belongings from the car, he told Lamolly to leave the property. Instead, the video supports Lamolly's version of events, as testified to by Agent Kovach, that Defendant threatened Lamolly with a gun.

Accordingly, the Court finds that the Government has proven by a preponderance of the evidence that, before any fighting began, Defendant pointed a gun a Lamolly in a threatening manner and told him to leave the property. Based upon this, the Court concludes that Defendant possessed the gun in connection with committing the crimes of simple assault and terroristic threats as those offenses are defined under Pennsylvania law. See Commonwealth v. Little, 614 A.2d 1146, 1152 (Pa. Super. Ct. 1992) ("It is well settled in Pennsylvania case law that pointing a gun at someone constitutes simple assault by physical menace"); In re Maloney, 636 A.2d 671, 676 (Pa. Super. Ct. 1994) ("[A]ppellant's allegation that Dr. Pyles pointed a gun at him and told him to 'get the fuck out of here' was

8

sufficient to establish a prima facie case of making a terroristic threat. The words spoken, combined with the pointing of the gun, suggest a threat that appellant would have been shot if he did not leave as Dr. Pyles had commanded."). Because either crime qualifies as a "felony offense" for purposes of § 2K2.1(b)(6)(B) of the Guidelines Manual, the Court finds that Defendant possessed a firearm in connection with another felony and, consequently, the four level enhancement was properly applied when calculating his total offense level.

## IV. CONCLUSION

For the reasons stated above, the Court will overrule Defendant's objection to the Presentencing Report and apply the four level sentencing enhancement. A separate Order follows.

Robert D. Mariani
United States District Judge